May it please the Court. Good morning, Your Honors. Jane Elson on behalf of Edward Cragg. I'll do my best to watch my own clock, and I'll try to reserve about three minutes for rebuttal. All right. Thank you, Counsel. If we could jump into the waiver of counsel, Your Honors. As I read the briefs, I don't see a genuine dispute between the parties that the operative phoreticology from April of 2018 was itself deficient under the three-factor framework. So out of the gate, that puts us in a legal posture where not only does the government bear the burden, and not only is the Court asked by the case law to indulge every presumption against a waiver, but we also find ourselves in the limited and rare exception of So could you slow down a little? Sorry. Thank you, Your Honor. I'm going to try to understand every word. Yes. Thank you. But we also are in the limited and rare exception of potentially finding a waiver, if any, outside of the actual phoreticology itself. And so that puts us in a place where we need to look carefully at the government's evidence and support of squeezing itself into the limited and rare exception. So let's please go through it. First the government cites Mr. Craig's arraignment, which you can find at Supplemental Excerpts 142 to 46. Now, the problem with the arraignment, Your Honors, as we've said in our reply brief, is it's legally irrelevant. Because as we know from the Court's case law, we only are what the Court said and understood. And if you read the arraignment transcript, Mr. Craig says not one word the entire time. So we don't know what he has said or understood. We don't know if he was paying attention. As far as the transcript is concerned, he may as well have not even been there. But did the magistrate judge advise the defendant of the penalties under which he was indicted? Yes, Your Honor. But you're just saying it's a blank record on what the defendant said. Absolutely. And I'll cite, Your Honor, the Ballot case at 1487 to 88, which says clearly that we're only concerned with what the defendant himself, and this makes sense, we're only concerned with what the defendant himself actually has represented he knows and understands. And so we don't know what Mr. Craig, what understanding, if any, Mr. Craig walked away from that hearing with. The government also tells us that Mr. Craig presumably learned the relevant information from his prior lawyers. And the use of the word presumably is a death knell for that argument itself, because as we just discussed, the Court has actually asked by the case law to indulge every presumption against the finding of a waiver, not the way the government is asking you to presume. The government also cites supplemental excerpts of Record 84 where Mr. Craig says, I've been made well aware of all these facts and charges. Now, that was at a prior representation hearing. Excuse me. And that transcript similarly begs the question, what was his understanding? He's referring to charges in the plural when, in fact, he was charged in a one-count indictment with a charge. So we don't know what he thought. And even if that did somehow speak to the issue of the nature of the charge, it also leaves unstated anything about the potential penalty. So that still leaves one factor unaddressed. How much time expired between the magistrate's advice of the penalties and the actual trial? That was well over a year, Your Honor. If I recall correctly, the arraignment was in January of 2017. The trial occurred in May of 2018. And the operative foretta colloquy, for our purposes here, was in April of 2018, so about a month before trial. The government also cites the first foretta hearing more generally. And I find that hearing really interesting, and here's why. Judge O'Neill made the same errors in that foretta colloquy as he did in the April 2018 foretta colloquy. There was a lot of emphasis on the dangers and disadvantages of self-representation and absolutely nothing about the penalties and the nature of the charge. So if anything, that tells us that Judge O'Neill, at least in Mr. Craig's case, was consistently misapplying this Court's clear three-factor test to take a lawful foretta waiver. And then finally, Your Honors, the government talks about Mr. Craig's personal characteristics, and we also know from the Vallow case, among others, that unless it's really, really specific to law, it's really basically irrelevant. And none of the personal characteristics that the government is citing about Mr. Craig speak in any way to his ability to effectively represent himself in a federal felony criminal trial. And so, ticking off all of these factors, which is really the only evidence the government has cited, I would refer the Court back to the Forrester case, which I regret I didn't cite in our opening brief, but I caught it for reply, thankfully. And there's a short sentence I'd like to read, Your Honors, from 507. And this is where the Court wrote, of course Forrester may have correctly understood the charge against him and the potential penalties, but the government has failed to prove that he did. And that's really, really, really similar to what we have here. There's some point. But if we faithfully apply the government's burden, if we faithfully apply the presumption against waiver, and we faithfully apply the Court's case law that we are in a limited and rare exception to the three-factor test, then the government simply hasn't pointed to any concrete evidence to carry its burden. And that's what I'd ask the Court to find. And if we agree that the Feretta advisory was inadequate, do we reach the rest of the issues in this case? I'd ask you, I'd ask the Court to at least reach suppression, Your Honors, because then, for purposes of a retrial, the suppression issue would be critical to shape the conduct of the trial. As far as the... That's a very close issue, so why don't you present your side of it? Thank you. So, again, with respect to suppression, the government has the burden. And I'd like to refer, Your Honors, specifically to excerpts of Record 76. This is, to me, in many ways, the rub of the issue. Now, this is a portion of the government's opposition memorandum in response to Mr. Craig's motion to suppress. And it's a portion of that brief which the District Court explicitly incorporated by reference as his own ruling. And there's a couple double negatives, so it's a little awkward, but I'm going to go through with you what the government said and the District Court adopted, because it is a flat wrong under Harrison and Tingle. It's an error of law which disposes of the issue, in my opinion. This is where the government wrote that it's not a constitutional violation if Mr. Craig was told that if he didn't immediately confess his criminal conduct, it would make his situation worse. Excerpts of Record 76. Now, under Harrison, page 891, and Tingle... What line are you reading from on 76? Your Honor, it's at the top. I wrote the page. I'm sorry. It's a... Let me grab it. Here we go. It is at... The full sentence starts, Your Honor, at line 4. Okay. The defendant's suggestion that he was told that if he told the truth, he would receive leniency, but that if he did not immediately confess his criminal conduct, it would make his situation worse doesn't establish that his statements were involuntary and obtained in violation of his Fifth Amendment rights. That's an incorrect statement of law, because as we know from Harrison and Tingle, if an interviewing agent or officer, in fact, tells the suspect that he'll be punished for his silence, that's a Fifth Amendment violation. It renders the confession involuntary. So that's an inaccurate statement of law adopted by the District Court. And so if we could look at the evidence that makes out that violation, the most egregious and the most... And timing-wise, the most important come from excerpts of Record 231. That's where Detective Redd says, and if it's something you haven't told us, it could work... Look worse later on down the road. I'm having a hard time imagining any meaning of that other than if you don't tell us, you're going to get in more trouble. But yet, of course, we have the Fifth Amendment right against self-incrimination. That's a violation. Same page. Excerpts of Record 231, later on down. The detective says, because when judges look at something and they go, okay, here's a person that did something wrong. They were either lying about it and, you know, basically F you, pardon my French. I don't know anything. Or they were like, you know what? Yeah, here's everything. Judges tend to look a little bit more like this person has some remorse. Now, this comment is in great symmetry with what happened in Harrison. In Harrison, I'm referring, Your Honor, to page 890 of that decision. What the officer said was, he asked the suspect whether she thought it would be better if the judge were told that she had cooperated or had not cooperated. Now, on that one question alone, the court threw out the entire confession. And that is pretty much exactly the same dynamic we have here on excerpts of Record 231, which the government has referred to as a 50-50 or a binary choice. If you just say by itself, you can get a benefit for cooperation. I have no issue with that. That is solid under the law. I can't complain about that. But when you combine that with, you're going to get punished if you don't talk, that's a constitutional violation. So this one little sentence, Harrison at 890, the court threw out the confession. Now, here on ER 231, we have two independent violations. And timing-wise, Your Honors, to put us even more under Harrison, we have Mr. Craig opening the floodgates of his inculpatory statements right after this. That's when he starts. And you can tell that that's what the detective was trying to do, because he starts this riff by saying, Look, Eddie, I get that you're being apprehensive. I get it. But, like, here's what's going to happen. Blah, blah, blah. You're going to get punished for silence. That's what happened. And so that was exactly what the court held in Harrison, too. The court noticed that once these improper statements had been introduced to the defendant's mindset, that's when she started talking. That's exactly what happened to Mr. Craig. That's when he started talking. So if you're — if the court reverses on Ferretta, Judge Wardlaw, yes, I would ask the court to reach suppression, because this shapes the trial significantly, and it's, in my opinion, a pretty obvious error of law. What were the statements primarily in this case that he made after the warning was given? I think the two most important categories were, number one, he gave up search terms that he had used. And if you recall what his defense was, it was that he liked a particular kind of adult pornography. But when he typed in his search terms, it pulled in contraband material as well. And so then his habit was to sort through it all and keep the adult pornography he was interested in. And so the search terms was hammered very heavily by the government at trial. And the other one was — the other major category, Your Honors, which I'm sure was not impressive to the jury, was when he made comments about how he found certain aspects of child pornography interesting, even though it wasn't his particular pornographic interest sexually. He kept it. He kept it for a while. He did. And that speaks to the jury instruction issue, Your Honor. He kept it. And he didn't really defend any issues about possession. So those were bad, and those were relied on heavily by the government at trial. If I could reserve the rest of my time, I'd appreciate it, Your Honors. All right. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. Ross Pearson for the United States. The focus in the Feretta Inquiry is not on what the district court said. There's no script for the district court to follow. It's on what the defendant understood. And in this case, looking at the whole record, the defendant understood the penalties and the charges he was facing. On what do you base that comment, that it — what the defendant understood? Sergeant Gerst can make it pretty clear that government bears the burden. It's a rare case if there's no explicit statement about the penalty that you don't meet the qualification. Well, Erskine makes it clear that — What is your case law to back up your point? Yes, Your Honor. So it is actually based on Erskine that we make that comment. Because in Erskine, the Court notes the defendant was — twice stated the penalties wrong during his Feretta Inquiry. And then the Erskine Court proceeded to look at the rest of the record to see if there was any indication that the defendant actually understood what they were. And they make the comment at page 1170 that it would be a different case if the defendant had said later on, perhaps at sentencing, that he had understood the penalties all along. And in this case, that's actually exactly what we have. Now, Craig filed further excerpts of record from the morning of trial, which would have been about 30 days after the Feretta Colloquy. And at those excerpts of record, which is FER3, the prosecutor, my trial partner, correctly stated the penalties. And Craig was asked about that and said, I'm well aware of that. This is only 30 days after the Feretta Inquiry. Prior to the Feretta Inquiry, he had also — He was well aware of what? The penalties? Of the penalties. Yes, Your Honor. And where in the — what did the court say to him when he responded, I'm well aware of that? It was a very short colloquy. The prosecutor correctly stated the penalties. The court asked the defendant if he understood that. And he said, yes, I'm well aware of that. At the time of sentencing? That was — that was the morning of trial, which was 30 days after the Feretta Inquiry. And so this is the — this is the situation, the limited exception, that the Erskine Court specifically said. Because the question is what the defendant understood when he waived his right to counsel and then decided to exercise his right. But why is what he said 30 days later relevant to what he understood when he waived counsel? It relates back. He wasn't — How does it relate back? Do you have a case on that? Relating back? It's in — it's in Erskine, Your Honor. Well, I mean, that case, Erskine — is it Erskine? Well, well, Hansen's is the case that establishes the rare exception, right? Sure, yes. But in that case, I mean, that — Hansen was very, very active both before and after in filing pro se motions and doing all of this sort of defense work. But here, we don't have the same situation. Well, Your Honor, we have him saying that he was well aware of the penalties. He says at a different point in the first sort of Feretta-type inquiry that he'd been made well aware of the facts and charges. The morning of trial — The facts and charges are quite different from the penalties, right? Right. It's the two prongs that he has to be aware of, though. Are there three prongs? And the third is the dangers of self-representation, which he's not disputing. The morning of trial, he also filed a lengthy motion, which I noticed as I was preparing for argument. It's not in the excerpt of the record, but it's at CR 93. And in that motion, on page 15 to 16, he raises a number of issues with prior attorneys. And he even says that at one point, one of his prior attorneys told him that he was facing charges for possession of child pornography. And he personally corrected him, saying, no, I'm facing charges for receipt of child pornography. That's charges again. Sorry. That's my summary of it. He specifically says, though, my attorney misadvised me of the charges. You don't have this in front of us. This is the second case this morning. You're coming up referring us to—we all work really hard to prepare for these, to hear these cases. And it's more than just issues of waiver and barbature. I mean, how can we be totally prepared to understand a case and talk to you about it if you haven't put stuff in the excerpts of record? I apologize, Your Honor. It is in the record as a whole, though. Yeah, we're supposed to go looking through the record as a whole as we listen to 40 cases a week. Your Honor, I'd be happy to file something after the hearing to highlight it for the Court's attention. But it's part of the whole record. And it indicates that the defendant did know what the charges were. He specifically said what the charges were. And since he had made that comment to a prior attorney before he was granted his right to represent himself, that indicates that when he was granted that right, he also knew what the charges were. He was also correctly advised at arraignment. You know, all of this trying to cobble all these things together to say—to prove now, after the fact, that this defendant understood at the time of the waiver the full penalties he was facing when he waived his right to have counsel is—it seems as though it would be so much easier if the U.S. attorney had just said, Judge O'Neill, you haven't advised him about the penalties. You need to do that. And you had taken care of it right at the trial. Well, Your Honor, the Ferretta inquiry was ex parte. It was during the defendant's motion for a new attorney. So we weren't in the courtroom when this happened. You'll see in the record that the U.S. attorneys came back in, and then Judge O'Neill said he's decided to represent himself or set for trial in a month. And we also wish that the inquiry at the time of Ferretta was more robust. It would have solved that. But that's not the question. There's not magic language for the district court to use. The court's still looking at what the defendant understood when he decided to go pro se. And what distinguishes this case from all of the cases that Craig relies on is there's also no misrepresentation. In Erskine, for instance, the defendant actually twice misstated the penalties. In Forrester, the court incorrectly advised the defendant of the penalties. And interestingly, the Forrester court said you can look to arraignment. But in that case, even at arraignment, the defendant hadn't been correctly advised of the penalties. In Rylander, the defendant filed multiple documents that indicated he didn't understand the nature of the charges. What is the government's best citation showing that Mr. Craig had a full understanding that he stated about the potential penalties in this case? It's the colloquy, the morning of trial, where he was advised of the penalties and said, I'm well aware of that. And this was only 30 days after he decided to proceed pro se. He didn't do a double take or indicate that he was surprised by that. With respect, the whole idea of the Erskine inquiry is whether he should represent himself. And if I understand you correctly, you're saying 30 days after he began to represent himself, literally on the day of trial, when he himself had prepared to represent himself, only then does the question come up, do you know what the penalties are? Is that a fair statement? It's mostly, I think. Okay, what am I missing? You're missing that the question is what he understood at the time he decided to represent himself. And Erskine says that to the extent that there's information after the Ferretta inquiry that would indicate what he understood at the time he decided to represent himself. But what you told me, if I understood you correctly, he didn't say, you know, 30 days ago when we had the Ferretta hearing, I understood that the penalties were X, right? That's right. So how do we know when he says on the morning of trial what he knew at the time the court approved his representing himself? You know it because there's no indication that he was surprised by it, that he said that... But it's the government's burden, right? It is, Your Honor. And he's advised correctly the first day he appears in court at his arraignment, he was given a penalty sheet, the penalties were correctly stated on the record. He never said that he didn't understand them. He said multiple times that he'd been made well aware of the charges and the penalties, and he even filed a motion saying what the charges were. So as my colleague cited on the Harkness states that this is supposed to be a very rare kind of a thing where you don't have something really explicit. Why does this case meet that requirement? Because the defendant has a constitutional right to represent himself, and it's protecting that right. It's not just his right to an attorney, it's the right to represent himself. In this case, there's no indication that he misunderstood what he was getting into. There's no indication that he didn't know what the penalties were or that he didn't know what the charges were. With respect, counsel, maybe you read Erskine differently than I do, but my understanding is you've got this three-pronged test, and our case law says that if the court has explained each of these things to him and is convinced that the defendant knows and understands what each element is, then the court can let the person represent himself. But if the court never says what the penalties are, it doesn't work. I don't see how you get around that. How do you get around it? It's because Erskine doesn't dictate what the court has to say. It just says that the defendant has to understand it. And every time the court's reviewing a FARETA inquiry at this phase, it means that the defendant has represented himself and has lost at trial, and the court's looking somewhere else in the record. In effect, you're taking the burden away from the government, and you're putting this requirement about an understanding of the penalties into some amorphous cloud. The defendant understood this because it's up in the cloud. It doesn't work, does it? I'm not trying to take the burden away from the government. I'm saying that it's in the what the penalties are, and the defendant says, I'm well aware of that. And that relates back to 30 days earlier when the defendant decided to exercise his right to represent himself. But it doesn't matter that at the date of the court's granting him permission to represent himself, we don't know one way or another whether he understood it. Thirty days later, you claim he did, but he didn't say, I understood it 30 days before. So do we not have to presume that the statement was not made at the time of the Feretta hearing, and because of that, we don't know whether the burden under Erskine was met? No, Your Honor. I think you can be confident that since he says, I'm well aware of it, that includes what he had known just 30 days earlier. How can you be confident of that? Because that's what the court— That's a sophistry, isn't it? Sorry, what was that? That's sophistry, isn't it? No, Your Honor, that's what the court considers in Erskine. And it's not always as clear as, I'm aware of it now, I was aware of it 30 days before, I was aware of it at my arraignment when the court told me, but— But he didn't say that. Right. But it doesn't have to be that clear. The question is— What if the first time he was told all the penalties in full was at sentencing? Would that relate back? It depends on what he indicated his understanding was. So if he said at sentencing, yes, I know that, I've been aware of that, then it would relate back. And that's what the court talks about in Erskine. I'd like to briefly move to the suppression issue. And the reason this case is different than Harrison and Tingle is because the message and the timing is different than both of those since he had already started talking to them and confessing, is they were telling him not to lie. If he was going to be talking, he shouldn't lie. And they confront him by saying it's time to come clean, time to be honest, and then that's when they say that they've found files on his computer and they're going to analyze his computer. And if there's something there that he hasn't told them about, it could be different later. I would agree with you that most of the statements were about not lying. But this statement, if it's something that you haven't told us, it could look worse later on down the road. Isn't that more about being silent about something rather than lying about something? No, because the officers had already, what the officers were talking about in the context is that they had already found child pornography downloading on his computer and that they were going to analyze the computer. And so in that context, it's saying, since he's already talking, if you're going to continue talking to us, it's important to tell the truth there. And I also want to point out that Craig makes the argument that this statement at ER 231 is what opened the floodgates and then elicited this confession. And effectively, it's the statement that broke his silence. That's not what actually happened. There was about 20 pages of transcript. The officers made the statement at ER 231. And then there's another 20 pages of meandering conversation where they cover topics such as his hobbies, his computer building, his time in the Air Force. Craig just said... I don't know. He doesn't just say if it's something... He goes on and says, now's the time to say, hey, you know, here's everything. Here's what I did. It's like, confess. And he has the right not to confess. He does. And he had already waived his right to remain silent and started talking to the officers. And that's why what they were telling him is, if you're going to continue talking to us, it's important to be honest. The point that Craig made was that the search terms were really the key thing that he confessed to. Those search terms didn't come until ER 253. The statement that he says opened the floodgates was at ER 231. And in the interim, there was lengthy conversation that was just meandering small talk about peer-to-peer accounts or computer building or hobbies. He wasn't under arrest at this time, was he? He was detained for purposes of Miranda. He had not been actually arrested. And they told him right before the statement at ER 231 that he was going to walk out of that police station and go home that day, which is actually what happened. I see my time is up. We ask that the Court affirm. Thank you, Counsel. So I think, if I'm interpreting the Court correctly, I agree with the Court's understanding of Erskine. What happened on the morning of trial was the AUSA made a crystal-clear articulation of what the penalties were in front of Mr. Craig. And then the district judge said, do you understand that? And he said, yeah, I'm well aware of that. So when I read that transcript page, it sounds like he's well aware of it because the AUSA just said it. And there's no evidence that that's not the case. So what the AUSA was trying to do was trying to button up the phoreticology because he saw this problem coming down the road. But what he should have done, Erskine was well on the books by that time. He could have said, were you aware of that fact at the ex parte hearing where I wasn't present, Mr. Craig, or something like that. That didn't happen. So under Erskine, that relation back doesn't happen. Again, we're presuming in favor of waiver, again, instead of presuming against waiver. So for purposes of understanding, Erskine, that speaks as of the time that the district court in this case allowed Mr. Craig to represent himself. Is that correct? Not a later point? I'm sorry, I don't think I understood, Your Honor. Erskine has a three-prong requirement. Those requirements have to be fulfilled before the district judge in this case allows him to represent himself. Is that correct? Correct. So in this case, the government is saying, well, 30 days later at the time of trial when he was already representing himself for 30 days, he became aware of that, as you point out. The AUSA stated on the morning of the trial what the penalties would be. The district court said, do you understand that? And he said, I'm well aware of it, as you pointed out. He had just heard them just then. Yes. But it doesn't say anything with respect to Erskine. And so my question is, when we construe Erskine, we're really talking about what the district court in this case knew at the time that the district court gave permission to Mr. Craig to represent himself, not what happened later on. Is that correct? That's correct. And that's what Erskine said. Erskine said, yeah, if you want to look at evidence from later on down the road in the record, that's okay. But there has to be some concrete tie-back to the actual threat of colloquy if you want to impute that later developed knowledge to the earlier point in time. Does that make sense, Your Honor? Yes. Okay. I see that, unfortunately, I'm out of time. Unless the court has any further questions? No, I don't think so. Thank you, counsel. Thank you. United States v. Craig is submitted, and we will take a... All right, even I don't know how to pronounce this. I'm going to say James, or Jaime's, versus Barr, and counsel can tell me how to correctly pronounce this.
judges: Siler, Wardlaw, M. Smith